**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**


**UNDERWRITERS INSURANCE CO.**                    **CIVIL ACTION**

**VERSUS**                                                              **NUMBER 04-140**

**OFFSHORE MARINE**                                     **SECTION "L" (1)**
**CONTRACTORS, INC., ET AL.**


## ORDER & REASONS

Pending before the Court is Offshore Marine Contractors, Inc.'s ("Offshore Marine")

Motion for Summary Judgement (Rec. Doc. 69) and Debis Financial Services, Inc.'s ("Debis")

Motion for Summary Judgment (Rec. Doc. 70).  For the following reasons, both motions are

GRANTED.

**I.      BACKGROUND**

In 1994, Offshore Marine Services, Inc. ("Offshore Marine") purchased a jack-up barge

named the L/B ATLAS ("the ATLAS").  After the purchase of the ATLAS, Debis provided a

loan to Offshore Marine, which was secured by a mortgage on the ATLAS.

On August 10, 2000, Offshore Marine renewed its coverage under a marine insurance

policy issued by Underwriters Insurance Company ("Underwriters").  The policy covered several

vessels owned by Offshore Marine, one of which was the ATLAS.  The marine insurance policy

included both Hull and Machinery coverage and Protection & Indemnity ("P&I") coverage.  As

part of the insurance policy, Offshore Marine warranted the seaworthiness of the ATLAS at the

time of making the application for renewal and at the inception of every voyage.

On August 15, 2000, the ATLAS broke ground and departed from Cameron, Louisiana

bound for the Matrix Oil ("Matrix") Production Platform located at West Cameron, Block 192, off the Louisiana coast.  Prior to breaking ground, however, the vessel's captain, Glenn Rodrigue, allegedly notified Offshore Marine's supervisory personnel that there was a bow in one or more of the vessel's four jacking legs, that one or more of the ATLAS' bilge pumps were not working, that one or more planetary gears utilized in moving the jack-up legs were inoperable, and that the port stern leg middle pinion gear had come out of its normal position and fallen on the deck.  Offshore Marine's supervisory personnel allegedly instructed Captain Rodrigue to "plug off" or bypass the affected planetary gear and not inform anyone of this problem, including the Matrix company representative who was on board the ATLAS.  As a result of the bypassing the middle pinion gear, only two of three planetary gears remained operable to move the port stern leg.

On August 16, 2000, the ATLAS collapsed and sank in the Gulf of Mexico while attempting to jack-up on location in West Cameron, Block 192.  The ATLAS sank in approximately sixty feet of water and was a total constructive loss.

As a result of the loss, Offshore reported the incident to Underwriters.  Underwriters then retained Andrew Wilson of Burke & Mayer as counsel to represent itself and Offshore Marine in connection with the property damage claims arising from the ATLAS' sinking.  In addition, Underwriters also retained Steege Kingston & Associates ("Steege Kingston") to investigate the cause of the sinking.

On August 31, 2000, Steege Kingston issued its second report to Underwriters.  In section 5.2 of the second report, Steege Kingston reported that the ATLAS' crewmembers had made allegations that the ATLAS was unseaworthy at the inception of its August 15th voyage.

2

The report indicated the following:

> We have had no access to the crew since the casualty.  Investigating officers from the USCG Marine Safety Office at Port Author, Texas have interviewed the crew as of August 30, 2000.  We have queried the [United States Coast Guard] as to their preliminary findings, and while they are generally unwilling to divulge such findings, they have indicated that the crew reported they experienced a problem with the jacking gear of the port aft leg prior to departure to WC192A.  Again, while we have not had access to the crew, we have queried [Offshore Marine which] indicated [it] was unaware of any problem with the port aft leg jacking system.
>
> [Offshore Marine] further states that when the crew experienced the initial problems at WC192A and called into the office, they were advised to cease any and all jacking evolutions, evacuate all personnel to the platform and await arrival of a relief liftboat to offload the deck cargo.  [Offshore Marine] states that [it] thinks the resultant failure at the port aft leg occurred because the Master attempted to level the vessel prior to arrival of the relief vessel.  Our investigation continues.

In sections 2.1 and 2.2 of Steege Kingston's third report, Steege Kingston once again acknowledged the allegations of unseaworthiness made by the ATLAS' crewmembers and reported upon its further investigation into the subject.  On September 8, 2000, Mr. Wilson reported to Underwriters that he had just obtained information from Matrix's counsel regarding the cause of the incident.  Specifically, Mr. Wilson reported:

> we have recently received information from counsel for Matrix indicating that the master of the L/B ATLAS at the time of this incident has allegedly admitted to the "company man" onboard the liftboat that the jacking mechanism for the port stern leg was malfunctioning at the dock or at some prior location before the voyage which led to this loss.  It is unclear when the admission was allegedly made.  This is the same jacking mechanism which purportedly failed at the time of the incident and purportedly caused the loss, according to the information we have received to date.
>
> Counsel for Matrix also recently advised that his representatives have told him that the master of L/B ATLAS had previously reported the problems with the jacking mechanism to [Offshore Marine's] representatives by cell phone repeatedly on several occasions some of which were just prior to the loss, but was told to proceed and to not report this information to Matrix.  Finally, counsel for Matrix advised that, according to his information, this account of the incident has been reported by the crewmembers to the United States Coast Guard's Marine Safety Office in Port Author.

       Obviously, the master's version of events as reported by counsel for Matrix is favorable to both the master's alleged personal injury claims and Matrix's theory of the case.  These allegations also conflict directly with the information provided in the last report from Steege Kingston & Associates.  It should also be noted that these allegations as set forth by counsel for Matrix, if proven, may also bar or adversely affect [Offshore Marine's] limitation of liability proceedings. Consequently, these allegations should be fully investigated to determine their veracity.

       . . .

       At this point in time, according to the report of our investigator, Jack Hoyle, it is our understanding that all of the crewmembers including the master are represented by counsel.  Consequently, there is no way to determine the veracity and validity of the representations of counsel for Matrix absent formal depositions or sworn statements with the crewmembers' attorney(s) present.

By late September 2000, notwithstanding the allegations made in the two reports and letter from Mr. Wilson, Underwriters decided to pay the full amount of the Hull and Machinery coverage.  As vessel mortgagee and a "loss payee" under the policy, Debis received $3,763,840.97 from Underwriters.  Additionally, Atlantic International, Ltd. ("Atlantic") received $1,236,159.03 from Underwriters.  Moreover, Underwriters had paid $425,000.00, less a $25,000.00 deductible, for wreck removal services.

On February 21, 2001, due to the filing of numerous personal injury and property damage claims arising out of the ATLAS' sinking, Offshore Marine initiated a limitation of liability proceeding in the Eastern District of Louisiana.[1]  In the action, Offshore Marine indicated that Captain Rodrigue, the master of the ATLAS, and other ATLAS crewmembers had alleged that they were injured as a result of the incident.  In addition, Offshore Marine further indicated that other claims for loss of cargo and equipment on the vessel, which were owned by third-parties,

---

[1] *In re Offshore Marine Service, Inc.*, 01-468 (E.D. La. 2/21/01).

would most likely be presented.  Moreover, Offshore Marine denied any liability arising out of the ATLAS' sinking.  At the time of filing and throughout the limitation proceeding, Mr. Wilson represented the interests of both Offshore Marine and Underwriters.

On June 13, 2002, following the completion of discovery, Mr. Wilson advised Underwriters that discovery sufficiently confirmed Captain Rodrigue's initial allegations—namely that Offshore Marine's supervisory personnel ordered him to depart for location with a faulty jacking system—and that there was only a twenty percent chance that the Court would find in favor of Offshore Marine.  Specifically, telephone records confirmed that there had been several calls to Offshore Marine's supervisory personnel from a payphone at the dock from which the ATLAS departed.  Shortly thereafter, on October 29, 2002, Underwriters settled the personal injury and property damage claims arising out of the sinking of the ATLAS.

On January 16, 2004, Underwriters brought the present action against Offshore Marine and Debis.  In its complaint, Underwriters claims that the ATLAS was neither seaworthy at the time Offshore Marine renewed its Hull and Machinery coverage nor at the time the ATLAS broke ground on August 15, 2000 and, as such, Offshore Marine breached its warranty of seaworthiness.  Furthermore, Underwriters alleges that Offshore Marine by failing to properly instruct Captain Rodrigue of various defects with the ATLAS' equipment and instructing him to conceal such defects breached its obligation of due diligence.  Moreover, Underwriters claims that Offshore Marine breached its warranty of good faith and fair dealing by misleading Underwriters subsequent to the ATLAS' sinking.  Based on these allegations, Underwriters prays for a judgment declaring that it is not liable for any payment under the insurance policy, that it is entitled to reimbursement for the payments it made, and that it is entitled to costs and

attorneys' fees.

## II.    PRESENT MOTIONS

In its motion for summary judgment, Offshore Marine contends that it is entitled to summary judgment for three reasons.  First, Offshore Marine contends that Underwriters waived its policy defenses by failing to reserve its rights or obtain a nonwaiver agreement while at the same time continuing to defend Offshore Marine in the limitation proceeding.  Second, Offshore Marine asserts that Underwriters is barred from bringing its claim because of the preclusive effect of the limitation proceeding.  Third, Offshore Marine argues that Underwriters' claim is barred by the principle of judicial estoppel.

In its motion for summary judgment, Debis contends that it is entitled to summary judgment for four reasons.  First, Debis claims that Underwriters' claim is barred by the admiralty doctrine of laches.  Second, Debis asserts that Underwriters has no cause of action under Louisiana law.  Lastly, Debis adopts Offshore Marine's third and fourth arguments regarding preclusion and judicial estoppel.

## III.   LAW AND ANALYSIS

### A.    Offshore Marine's Motion for Summary Judgment

State law governs the construction of marine insurance policies except where displaced by admiralty law.  *Employers Ins. of Wasau v. Trotter Towing Corp.*, 834 F.2d 1206, 1210 (5th Cir. 1980).  There are no specific and controlling federal admiralty rules involving breach of warranty in contracts of marine insurance.  *Wilburn Boat Co. v. Fireman's Fund Ins. Co.*, 348 U.S. 310, 320 (1955); *Ins. Co. of N. Am. v. West of England Shipowners Mut. Ins. Assoc.*, 890 F.Supp. 1302, 1305-06 (E.D. La. 1995).  As such, state law must apply.

In the present case, the insurance policy was brokered and delivered in Louisiana, the vessel's home port was in Louisiana, and, at the time of loss, the ATLAS was off the coast of Louisiana.  Accordingly, the Court will apply Louisiana law.

The Louisiana law of waiver as it applies to insurance defenses was set forth in *Steptore v. Masco Constr. Co.*, 643 So. 2d 1213, 1216 (La. 1994).  Pursuant to *Steptore*, if an insurer has knowledge of facts indicating noncoverage under the insurance policy and assumes or continues the insured's defense without obtaining a nonwaiver agreement to reserve its coverage defense, the insurer shall be found to have waived such defense.  *Id.*; *see also Peavey Co. v. M/V ANPA*, 971 F.2d 1168, 1175-76 (5th Cir. 1992); *In re Cudd Pressure Control, Inc.*, 109 F. Supp. 2d 486, 490 (E.D. La. 2000); *Ins. Co. of N. Am. v. West of England Shipowners Mut. Ins. Assoc.*, 890 F. Supp. 1302, 1308-1309 (E.D. La. 1995).  Moreover, "waiver principles are applied stringently to uphold the prohibition against conflicts of interest between the insurer and the insured which could potentially affect legal representation in order to reinforce the role of the lawyer as the loyal advocate of the client's interest."  *Steptore*, 643 So. 2d at 1216.

With this in mind, Offshore Marine asserts that Underwriters, by virtue of Steege Kingston's reports and Mr. Wilson's September 8th letter, acquired knowledge of facts indicating noncoverage and continued its joint representation of Offshore without a nonwaiver agreement or reservation of rights.  Therefore, pursuant to *Steptore*, Offshore Marine contends that Underwriters waived its policy defenses.  The Court agrees.

In this case, it is a <u>fact</u> that the ATLAS' crewmembers and counsel for Matrix reported that the ATLAS was unseaworthy.  It is clear Underwriters had <u>knowledge</u> of these facts.  These facts <u>indicated noncoverage</u>.  Underwriters did not obtain a nonwaiver agreement or issue a

reservation of rights.  Therefore, Underwriters waived its policy defenses.

In opposition, Underwriters contends that the facts of this case are sufficiently distinguishable from the four cases cited by Offshore Marine such as to justify a finding that Underwriters did not waive its policy defenses.[2]  Specifically, Underwriters asserts that all four cases present situations in which an "actual fact" or even an admission by the insured, not a mere allegation, was made known to the insurer.  Essentially, Underwriters is arguing that it did not know whether the crewmembers' or counsel for Matrix's claims were true.  Therefore, according to Underwriters, these claims were mere allegations and, as such, did not require Underwriters to obtain a nonwaiver agreement or issue a reservation of rights.  The Court disagrees.

According to the applicable caselaw, an insurer does not need to know to an absolute certainty that it has a coverage defense.  For instance, in *Steptore*, the Louisiana Supreme Court noted that allegations in a petition, which can hardly be considered "actual facts," are sufficient to put an insurer on notice of its coverage defenses.[3]  *Id.* at 1217.  Additionally, the Fifth Circuit in *Peavey* spoke directly on this point.

In *Peavey*, a vessel, while headed down the Mississippi River, lost electrical power and struck a wharf causing damage to the wharf, itself, and its cargo.  971 F.2d at 1170.  The vessel owners claimed that the power loss resulted from its temporary cargo fumigation system, which was installed by Degesch America, Inc.  *Id.*  On March 17, 1989, five days after the accident, the

---

[2] In support of its argument, Offshore Marine relied upon *Peavey*, *Reliance Ins. Co. v. The Escapade*, 280 F.2d 482 (5th Cir. 1960)*, Cudd Pressure*, and *West of England*.

[3] In *Steptore*, the insurer's vice president also admitted that he knew of a fact indicating noncoverage on the day of the accident.  643 So. 2d at 1217.  From the court's opinion, however, it appears as if either the vice president's knowledge or the allegations in the petition were sufficient to require a nonwaiver agreement or a reservation of rights.  *Id.*

vessel owners informed Degesch that they intended to hold Degesch fully responsible for the allision. *Id*.

After being notified of the accident, Degesch retained Ralph Smith as counsel to discover the exact nature of the accident. *Id*. Despite being contractually obligated to provide immediate notice of any claims to its insurer, which was Zurich Insurance Co., Degesch failed to provide any notice to Zurich until January 2, 1990. *Id*. at 1171. Soon after being provided notice of the claim, Zurich requested and received from Mr. Smith all the investigative materials and reports that had been made to Degesch. *Id*. at 1175. These materials and reports indicated that Degesch was most likely not at fault, but further testing was being done. *Id*. at 1175 n.12.

On March 9, 1990, the cargo owner filed suit against both Degesch and Zurich, which learned of the suit on March 12, 1990. *Id*. at 1171. On March 26, 1990, Zurich hired Mr. Smith, who was still representing Degesch, to represent it. *Id*. On May 29, 1990, Zurich finally issued a reservation of rights letter to Degesch; however, Mr. Smith continued to represent both Degesch and Zurich until November 8, 1990. *Id*.

Eventually, Zurich reached a settlement with all the parties involved and then filed a cross-claim against Degesch for recovery of the amount it paid in settlement and for the attorneys' fees it incurred in defense of the suit. *Id*. Zurich asserted that Degesch failed to provide it with immediate notice and, as such, it could deny Degesch's claim under the terms of the insurance contract and seek reimbursement for the amount it paid. *Id*. at 1173. In opposition, Degesch argued that Zurich had waived its policy defenses by retaining the same counsel and failing to obtain a nonwaiver agreement or issue a reservation of rights. *Id*. at 1175.

Applying Louisiana law of waiver, the Fifth Circuit found that Zurich should have

obtained a nonwaiver agreement or issued its reservation of rights letter within a reasonable time after January 2, 1990—the date it was informed of the occurrence. *Id.* It did not matter if the cause of or liability for the allision was in dispute or whether Zurich believed its insured's representations of non-liability. All that mattered was that Zurich was informed of the occurrence, retained the same counsel as its insured, and failed to obtain a nonwaiver agreement or issue a reservation of rights. Similarly, in the present case, Underwriters was informed of the occurrence, obtained the same counsel to represent itself and its insured, and failed to obtain a nonwaiver agreement or issue a reservation of rights. Therefore, the Court finds that Underwriters waived its policy defenses.

Having found that Underwriters waived its policy defenses, the Court need not address Offshore Marine's preclusion and estoppel arguments.

**B.    DEBIS' Motion for Summary Judgment**

**i.    Laches**

The admiralty doctrine of laches provides that a maritime cause of action for property damage will be dismissed if there has been inexcusable delay in instituting a suit and prejudice resulting therefrom to the defendant. *Akers v. State Marine Lines*, 344 F.2d 217, 219 (5th Cir. 1965). In considering whether laches is applicable in a given case, the analogous state statute of limitations and the equitable circumstances of each case must be considered. *Czaplicki v. S.S. Hoegh Silvercloud*, 331 U.S. 525 (1956). A plaintiff's failure to bring a claim within the time allowed under the analogous state statute of limitations creates a rebuttable presumption of prejudice and inexcusable delay. *Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1057 (5th Cir. 1982).

Based upon Underwriters' causes of action, Debis claims that the analogous Louisiana state prescriptive period is the one-year period for tort actions set forth in article 3492 of the Louisiana Civil Code.  On the other hand, Underwriters contends that the analogous Louisiana state prescriptive period is the ten-year period for contract actions set forth against it article 3499 of the Louisiana Civil Code.

In support of its position, Debis relies solely upon *Aetna Casualty & Surety Co. v. Stewart Constr. Co., Inc.*, 00-1332 (La. App. 5 Cir. 2/28/01), 780 S.2d 1253.  Debis' reliance is mistaken.  In *Aetna*, the Louisiana Fifth Circuit Court of Appeal was faced with determining whether an insurer's claim for damages resulting from an insured's misstatements was subject to a one-year prescriptive period or a ten-year prescriptive period.  *Id*. at 1256.  In the insured's application for insurance, he made several misstatements that caused the insurer to charge him a lesser premium.  *Id*. at 1255.  The insured claimed that the insurer's action was based in tort; whereas, the insurer claimed that the action was based in contract.  *Id*. at 1256.  The court found that the application was never made a part of the insurance policy and, as such, had no contractual force.  *Id*.  Therefore, the court found that the action was based in tort and applied the one-year prescriptive period.  *Id*.

Conversely, in the present case, Underwriter's claims are founded on Offshore Marine's breach of warranty, which is based squarely in the insurance policy.  The key in differentiating a breach of contract from a tort for prescriptive purposes is the source of the duty breached.  *Damages ex contractu* flow from the breach of a special obligation contractually assumed by the obligor.  *Davis v. LeBlanc*, 149 S.2d 252, 254 (La. App. 3 Cir. 1963).  *Damages ex delictu* flow from the violation of a general duty owed to all persons.  *Id*.  Therefore, where, as in this case,

11

liability arises "because of the defendant's violation of certain special obligations assumed by him as a result of his entering into a contract[,]" the ten-year prescriptive period for contract actions applies.  *Id.*  Since the basis of Underwriters' suit is Offshore Marine's breach of the warranty of seaworthiness, which arose from the parties' insurance policy, the analogous state statute of limitations is ten years.

Since this lawsuit was filed on January 16, 2004, which is less than ten years from Offshore Marine's alleged breach of the insurance policy, Debis bears the burden of proving both Underwriters' inexcusable delay in instituting this suit and its own prejudice resulting therefrom.  In regards to inexcusable delay, Debis claims that Underwriters had no reason to wait to file this suit for either the nearly three and a half years from first learning of Captain Rodrigue's allegations of unseaworthiness or the one and a half years from the termination of the limitation proceeding.  The Court finds that Underwriters' wait of either one and a half or three and a half years to file suit was not inexcusable.  During this time, Underwriters was faced with different factual accounts, had to investigate the cause of the accident to find the truth, and then decide what was the best means to recover its payments.  Considering that the analogous state statute of limitations is ten years, the passage of this amount of time was not inexcusable.

Moreover, Debis contends that it has been prejudiced because the Debis' office that handled the ATLAS mortgage has shut down, Debis personnel have left, and Debis has lost knowledge and information that could have helped it defend Underwriter's claims.  Debis, however, provides no elaboration or factual support for this assertion.  Instead, its allegations are merely conclusory and insufficient to satisfy its burden.  Therefore, the Court finds that Undewriters' claims are not barred by laches.

ii.    **No Cause of Action under Louisiana Law**

In the absence of a specific and controlling federal rule, cases involving marine insurance contracts are to governed by "the law of the state where the marine insurance contract was issued and delivered." *Nat'l Mar., Inc. v. Glencore, Ltd.*, 1998 WL 204734, at *2 (E.D. La. Apr. 23, 1998). There are no specific and controlling federal admiralty rules involving breach of warranty in contracts of marine insurance. *Wilburn Boat Co.*, 348 U.S. at 320; *West of England*, 890 F. Supp. at 1305-06. Therefore, since the insurance policy between Underwriters and Offshore Marine was issued and delivered in Louisiana, Louisiana law governs Underwriters' action against Debis.

Pursuant to *Pilgrim Life Insurance Co. of America v. American Bank & Trust Co. of Opelousas*, Debis contends that Underwriters has no cause of action for reimbursement against it. 542 So. 2d 804 (La. App.3 Cir. 1989). In *Pilgrim Life*, the insured purchased a vehicle that was financed through the defendant-mortgagee. *Id*. at 805. In connection with the purchase, the insured obtained a policy of disability insurance from the plaintiff-insurer. *Id*. The monthly benefits under the insurance policy equaled the monthly payments that the insured was to make to the mortgagee under their financing agreement. *Id*. Therefore, the insured named the mortgagee as the primary beneficiary of the insurance policy. *Id*.

After sustaining an injury, the insured submitted a claim to the insurer along with a doctor's statement certifying that he was "totally disabled" under the insurance policy. *Id*. Thereafter, the insurer began paying the monthly benefits directly to the mortgagee. *Id*.

Approximately one year later, the insurer learned that the insured had not been totally disabled. *Id*. After the insured filed for bankruptcy, the insurer filed an action directly against

the mortgagee seeking to recover the payments it had erroneously paid the insured.  *Id.*

Applying Louisiana law, the court found that the insurer had no cause of action against the mortgagee.  *Id.* at 806-07.  First, the court found that the insurer could not recover under Louisiana Civil Code article 2301 because the mortgagee was owed a valid debt and it accepted the payments in good faith.  *Id.* at 806.  Second, the court found that the insurer could not recover under Louisiana Civil Code article 2302 because a debt was due the mortgagee.  *Id.* Lastly, the court found that the insurer could not recover pursuant to an unjust enrichment claim because the mortgagee's enrichment was justified by the existence of the contract between the mortgagee and the insured, and the insurer had another remedy at law in the form of a suit against the insured.  *Id.* at 807.

The present case is similar to *Pilgrim Life*.  Debis was owed a valid debt by Offshore Marine and accepted Underwriters' payments in good faith.[4]  Moreover, a debt was due Debis, Debis' enrichment was justified by the existence of its contract with Offshore Marine, and Underwriters has another remedy at law in the form of its suit against Offshore Marine.  Thus, the Court finds that Underwriters does not have a cause of action for reimbursement against Debis.[5]  *See also* 16 Couch on Insurance § 226:57 (3d ed. 2005); 46A C.J.S. *Insurance* § 1458 (1998).

---

[4] There is simply no evidence suggesting that Debis participated in any wrongdoing or had knowledge of any wrongdoing.  In fact, the discovery presented to the Court confirms the lack of any participation or knowledge.

[5] In opposition, Underwriters cites to *Ashworth v. State Farm Fire & Cas. Ins. Co.*, 738 F. Supp. 1032 (W.D. La. 1990).  This case has no bearing on the instant matter.  In *Ashowrth*, the mortgagee was not a party to the lawsuit, and the court ordered the insured, himself, to fully reimburse the insurer.

14

Having found that Underwriters does not have a claim under Louisiana law, the Court need not address Debis' preclusion and estoppel arguments.

IV.   **CONCLUSION**

For the foregoing reasons, both Offshore Marine's and Debis' motions for summary judgment are GRANTED.

New Orleans, Louisiana, this __25th__ day of __July__, 2006.

UNITED STATES DISTRICT JUDGE